UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN A. BRYCE,

       Plaintiff,                       Civil Action No. 12-14618

v.                              HON. MARK A. GOLDSMITH
                              U.S. District Judge
                              HON. R.   STEVEN WHALEN
COMMISSIONER OF SOCIAL      U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Justin A. Bryce brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.   Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On August 19, 2011, Plaintiff filed applications for DIB and SSI, alleging disability as of January 1, 2009 (Tr. 196-197, 198-203).   After the initial denial of the claim, Plaintiff requested an administrative hearing, held on April 10, 2012 in Mount Pleasant,

–1–

Michigan[1] (Tr. 31).   Administrative Law Judge ("ALJ") Jessica Inouye presided (Tr. 31). Plaintiff, represented by John Wildeboer, testified (Tr. 36-79), as did Vocational Expert ("VE") Mary Williams (Tr. 80-87).

On May 1, 2012, ALJ Inouye found that Plaintiff was not disabled through the date of the decision[2] (Tr. 26).   On August 20, 2012, the Appeals Council denied review (Tr. 1-5). Plaintiff filed suit in this Court on October 18, 2012.

## I.  BACKGROUND FACTS

Plaintiff, born March 30, 1989, was 23 at the time of the administrative decision (Tr. 26, 196).    He completed eighth grade and worked previously as a care provider for his mother, cook, auto detailer, and sorter (Tr. 233-234).   His application for benefits alleges disability as a result of Post Traumatic Stress Disorder ("PTSD"), anxiety, Attention Deficit Disorder ("ADD"), and substance abuse (Tr. 233).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

---

[1]A brief telephonic hearing was held on January 24, 2012, at which time Plaintiff requested additional time to obtain an attorney (Tr. 89-96).

[2]While Plaintiff's entitlement to DIB benefits expired after June 30, 2010, his prospective entitlement to SSI required the consideration of the evidence up through the date of the decision (Tr. 18, 26).

He stood 5' 7" and weighed 180 pounds (Tr. 36).   His weight had been stable since he began taking Seroquel (Tr. 37).   He was right-handed, single, and childless (Tr. 37).   He lived in a single family home with his girlfriend, mother, and stepfather (Tr. 37).   No one in the home was currently employed (Tr. 37).   His mother and stepfather had been disabled since a 2007 car accident and his girlfriend attended school (Tr. 38).   His driver's license was suspended after he received a speeding ticket (Tr. 38).   He relied on his mother and girlfriend for transportation (Tr. 38).

Plaintiff left school after eighth grade but was currently taking classes to obtain a GED (Tr. 39).   He experienced difficulty following the instructor (Tr. 39).   During his school years, he was placed temporarily in special education but was expelled for fighting (Tr. 39).    His reading difficulties stemmed from his failure to attend school regularly (Tr. 40).   He could read a short article in a newspaper and make a shopping list, but had trouble performing calculations (Tr. 40).

Plaintiff worked as his mother's care giver for a short period but was unable to perform all of the requirements of the position (Tr. 41).   He became "freaked out" and depressed after his mother was injured in the 2007 accident (Tr. 41).   He stated that anxiety prevented him from acting as a care giver to his mother (Tr. 44).   He was terminated from one job due to uncontrollable shaking and twitching (Tr. 41).   He wanted to work, but noted that he had not looked for a job in the past year (Tr. 41-42).   He worked in 2010 as a cook but because he "was getting paid cash," the income would not "show up" on an earnings statement (Tr. 42).   He was terminated on the purported basis that he was

not performing his job duties, but in actuality, was terminated when a former employee returned to claim the job (Tr. 43).

When asked why he believed he was disabled, he stated as follows:

> I don't think I'm disabled.  Well, [mental hospital and DHS personnel] made me sign up for this. . . . I mean, I know I can't do everyday tasks that everybody else can, but I think I can still do things.  I don't want to be disabled.  I don't want this. . . . [T]hey just signed me up with everything, and I just went with it (Tr. 44).

He opined that he was required to apply for disability benefits "to get [his] medical bills paid" (Tr. 45).

Plaintiff offered additional testimony:

He experienced seizures and had experienced "uncontrollable" body movements for approximately one year (Tr. 45).   His last seizure was approximately eight months before the hearing (Tr. 45).   The shaking and seizures were not related to drug or alcohol use (Tr. 46).   He had been "clean for a long time," but still experienced seizures (Tr. 46).   He did not use alcohol, but admitted to marijuana use approximately one month before the hearing (Tr. 47).   He had not followed through on recommendations to see a neurologist (Tr. 47). He had experienced a total of six or seven seizures (Tr. 48).   He was prescribed Dilantin, but the prescription was discontinued after it interfered with a Seroquel prescription (Tr. 48).

He experienced hallucinations and sleeplessness for up to three days after ceasing the use of Seroquel (Tr. 49).   Two months before the hearing, he "committed" himself after he began hallucinating (Tr. 49).   He took Zyprexa, Klonopin and Pristiq, but

–4–

experienced fewer hallucinatory episodes when taking Seroquel (Tr. 50).   He had seen his psychiatric counselor since being released from the hospital (Tr. 51).

He had tried to kill himself "a few times," but the attempts were not related to his previous opiate addiction (Tr. 53-54).   He completed a "rehab" program but realized that he was getting "high" from the medication prescribed to reduce his dependency on opiates (Tr. 54).   He denied the current use of opiates (Tr. 55).   His parents' alcoholism deterred him from using alcohol (Tr. 56).   He continued to "cut" himself (Tr. 57).

His work-related limitations consisted of sleep deprivation, uncontrolled movements, and anxiety (Tr. 57).   Anxiety attacks were characterized by a racing pulse, sweating, and agitation (Tr. 58).   He experienced anxiety in large crowds (Tr. 58).   He coped with anxiety by playing his guitar (Tr. 58).    He experienced some level of anxiety every day (Tr. 58).

In response to questioning by his attorney, Plaintiff stated that he experienced depression approximately once a month (Tr. 59).   He had attempted to kill himself on separate occasions by hanging and a medication overdose (Tr. 59).   He coped with depression by cutting himself, using a computer, or going outside and "lift[ing] bricks" (Tr. 60, 62).   He experienced anxiety beginning in fifth grade as a result of being abused by his father (Tr. 61).   At present, he became jumpy when sitting in a movie theater or watching a movie at home (Tr. 62).    He was able to watch an entire movie at a theater, provided that the theater was not crowded (Tr. 72).   He had been involved in "numerous assaults," adding that he assaulted some individuals on the most recent New Years' Eve after

–5–

someone grabbed his girlfriend (Tr. 64).   He would typically choke or punch others (Tr.

65).   He experienced "bad nightmares" (Tr. 66).   He was able to shop, noting that he had

shopped on the morning before the hearing (Tr. 66).   He did not leave his home often as a

result of depression or stubbornness (Tr. 67-68).   He noted had been involved in several

accidents riding a "four-wheeler" and motorcycle (Tr. 68-69).   He spent his time washing

dishes, cleaning, doing laundry, and performing household repairs (Tr. 70).   He went to

church every Sunday and attended Bible study once a week (Tr. 70).   He stated that

nightmares were triggered by reading the book of Revelations (Tr. 71).   He composed

music with other church members and played in "a little acoustic band . . . for fun" (Tr. 73).

He helped take care of his family's five dogs and two cats (Tr. 73).   He felt "a hundred

percent better" since ceasing the use of opiates (Tr. 76).

As to physical limitations, he was unable to perform any significant lifting with his

right hand due to repeated bone fractures (Tr. 76).

**B.   Medical Evidence**

**1.   Treating Records[3]**

---

[3]Records predating the January 1, 2009 alleged onset of disability are included for
background purposes only.

October, 2004 therapy records state that Plaintiff slapped his sister after getting "mad," but consistent with other bouts of anger, felt remorse for his actions later (Tr. 483, 489). He stated that using marijuana helped him control his anger (Tr. 489). December, 2006 treating notes state that Plaintiff, then 16, experienced anxiety and depression (Tr. 474). The following month, Plaintiff reported that he was living with his grandmother after getting into a physical fight with his stepfather (Tr. 475, 541, 545).

An October, 2009 x-ray showed a "tiny fracture" of the fifth finger of the right hand sustained after he "punched somebody" (Tr. 421, 574). Plaintiff sought emergency treatment in June, 2010 after sustaining injuries in a "four wheeler" accident (Tr. 419-420, 666-667). Imaging studies were negative for fractures (Tr. 419-420). In February and March, 2010, Plaintiff received two days of inpatient rehab treatment (Tr. 376-387). He was deemed a high risk for experiencing withdrawal symptoms, additional psychological symptoms, and relapse (Tr. 384). Plaintiff reported blackouts as a result of opiate use (Tr. 383). He admitted to the use of cannabis, hallucinogens, heroin, "other opiates," and nicotine (Tr. 382). He appeared well groomed with normal speech, thought process, and appropriate affect (Tr. 381). The examiner noted that Plaintiff exhibited tremors (Tr. 381). Plaintiff reported that his biological father was "physically violent to the whole family" until his parents divorced when he was 11 (Tr. 380).

In October, 2010, Plaintiff was admitted for an eight-day inpatient stay after experiencing mood swings and suicidal ideation (Tr. 391). He reported sleep disturbances and poor concentration (Tr. 391). He denied the current use of prescription drugs or legal

problems (Tr. 391).    He reported abuse by his father prior to his parents' divorce (Tr.

391).    Upon admission, he was assigned a GAF of 20[4] (Tr. 391-392).    He tested positive

for opiates (Tr. 389).    Upon discharge, he appeared "alert, friendly, talkative, and free of

any acute psychotic symptoms or anxiety problems" (Tr. 389).    He was assigned a GAF of

60[5] (Tr. 389).

Outpatient notes from the same month indicate that Plaintiff's mother used cocaine

and dropped acid while pregnant with him (Tr. 427).    Plaintiff began abusing drugs as a

teenager (Tr. 427).    He reported work as a framer, roofer, car detailer, and cook (Tr.

427-428).    His concentration and attention was deemed "poor" (Tr. 431).    He was

assigned a GAF of 31-35[6] (Tr. 432).    Plaintiff requested medication for anxiety (Tr. 432).

He expressed a desire for "a good job and a successful life," and cessation of nightmares

(Tr. 436).    He reported better sleep after being prescribed Seroquel (Tr. 440).

---

[4]A GAF score of 11–20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication."    *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*")(4th ed.2000).

[5]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

[6]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM-IV-TR* at 34.

In January, 2011, outpatient notes state that Plaintiff stopped taking Seroquel after experiencing involuntary twitching (Tr. 446).    Plaintiff canceled an April, 2011 counseling session to go to a job interview (Tr. 450).   In May, 2011, Plaintiff sought emergency treatment for seizures after breaking up, then getting back together with his girlfriend (Tr. 415, 452-453).   Hospital personnel doubted the presence of a seizure, noting "so much psychological stuff going on" (Tr. 415).   He was administered Dilaudid and discharged in stable condition (Tr. 416, 596, 600). In June, 2011, Plaintiff sought emergency treatment after sustaining injuries in a motorcycle accident (Tr. 675). The same month, he was admitted for five days of inpatient treatment after threatening suicide unless his psychotropic medication was refilled (Tr. 339-403, 619-620).    He was assigned a GAF of 30-35 upon admittance and 40-45 upon release[7]  (Tr. 401-402).    Outpatient notes from August, 2011 state that he reported better sleep after resuming Seroquel (Tr. 462-463).

---

[7]A GAF score in the range of 21-30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. " *DSM-IV* at 34. A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

September, 2011 emergency room notes state that Plaintiff sought treatment after being thrown from a "go cart" (Tr. 629).   Imaging studies were negative for fractures (Tr. 631-636).   October, 2011 outpatient notes state that Plaintiff was tearful as a result of his grandmother's death the previous week and expressed distrust with his girlfriend after she "cheated on him" (Tr. 499).   The same month, Plaintiff was deemed "suicidal" as a result of a mental illness (Tr. 643).   Plaintiff threatened to cut himself (Tr. 645).   In December, 2011, Plaintiff reported that he was healthy and that his seizures stopped when he ceased taking opiates (Tr. 502).   He was assigned a GAF of 41 due to mild depression, cannabis dependence, and anxiety (Tr. 504).   He denied hallucinations and exhibited "adequate" judgment (Tr. 506). Assessment notes state that he was using prescribed medication appropriately and was not engaged in substance abuse but sought a prescription for Valium (Tr. 510, 522). Plaintiff reported that he was restarting therapy at the direction of his "disability attorney" (Tr. 526).   Outpatient notes from later the same month state that Plaintiff's condition was improving (Tr. 517).   Early the following month, Plaintiff sought emergency treatment for a hand injury after an altercation (Tr. 825).   Imaging studies were negative for fracture or dislocation (Tr. 825-826).   He was encouraged to obtain employment (Tr. 518). In February, 2012, Plaintiff sought emergency treatment after sustaining injuries in a car accident (Tr. 652). Imaging studies were negative for fractures (Tr. 651-654).

The following month, Plaintiff consented to a voluntary commitment (Tr. 678).   He reported hearing voices commanding him to kill himself since the car accident the previous

month (Tr. 678).   He reported that prior to the commitment, he attempted to self-medicate the hallucinations by using Dilaudid (Tr. 679).   Intake notes state that Plaintiff exhibited symptoms of "coming off opiates" (Tr. 790).   Adam D. Nicholas, M.D. found that Plaintiff presented "poor problem-solving skills, chronic substance abuse, and inadequate coping mechanisms" (Tr. 680).   Plaintiff was assigned a GAF of 30 at the time of admission (Tr. 753).   Dr. Nicholas recommended individual, group, and occupational therapy (Tr. 681).   Plaintiff was deemed a moderate suicide risk (Tr. 684).   The day after his admittance, he stated that the "voices" were no longer telling him commit suicide but were "chattering" (Tr. 686).   Four days following his admittance, he denied hearing voices, reported that he was "much improved," after a medication change and exhibited a normal affect (Tr. 698).   He denied suicidal thoughts (Tr. 698).   Dr. Nicholas assigned him a GAF 50, recommending follow-up psychiatric services and individual psychotherapy (Tr. 698, 700).

### 2.   Non-Treating Records

In September, 2011, psychologist Judy Strait performed a non-examining assessment of the treating records on behalf of the SSA, noting diagnoses of depression, anxiety and a substance abuse disorder (Tr. 101-102).   She found the presence of mild limitation in activities of daily living, and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 102).   Dr. Strait also performed a Mental Residual Functional Capacity Assessment, finding that Plaintiff experienced moderate limitations in carrying out detailed instructions; maintaining concentration for extended periods,

working within a schedule or without psychological distractions; working in coordination with others; responding to workplace changes; and working independently (Tr.   104-105). Dr. Strait concluded that Plaintiff would work "best alone or in a small familiar group" (Tr. 106).   She found that he could complete routine two-steps tasks "on a sustained basis" (Tr. 106).

### 3.   Evidence Submitted After the May 1, 2012 Administrative Decision

On July 13, 2012, Plaintiff's counsel submitted a letter by Plaintiff's mother for Appeals Council review containing "observations regarding the conclusions drawn" by the ALJ pertaining to Plaintiff's activities of daily living (Tr. 348, 349-353).   Plaintiff's mother disputed the ALJ's finding that her son drove "four-wheelers" all the time, stating that in five years, Plaintiff had driven the vehicle on only 10 occasions and on each occasion, had driven in a way that was a hazard to himself and others (Tr. 349).   She stated that her son attended bible study and church on a sporadic basis (Tr. 350) and was not making significant efforts to obtain his GED (Tr. 351).   She stated that he rarely helped with household or yard chores and generally relied on her to shop for groceries (Tr. 351-352).   She indicated that Plaintiff minimized his psychological symptoms which included the destruction of household property (Tr. 352-353).

### C.   Vocational Expert Testimony

VE Mary Williams classified Plaintiff's former work as a home attendant as semiskilled and exertionally medium as described by the Dictionary of Occupational Titles

("DOT") but heavy as performed by Plaintiff[8] (Tr. 81).   Assuming Plaintiff's age,

education, and work background, the ALJ posed the following hypothetical question:

> This work should avoid all hazards.  This individual should be limited to
> unskilled simple, routine, and repetitive work.  This individual would work
> best in small familiar groups of co-workers, should not be required to work in
> large groups or large crowds, and only occasional contact with the public in
> small numbers.  So, contact with one or two people at a time, but contact
> with the public like in a large, you know, like working at a busy amusement
> park for example.  Not large crowds of people.  Can the hypothetical
> individual perform the claimant's past work? (Tr. 81-82).

---

[8]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10
pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and
small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.

The VE found that the hypothetical individual would be unable to perform Plaintiff's past job as a home attendant, but could perform the medium, unskilled work of janitor (15,000 existing positions in the State of Michigan); groundskeeper (4,000); and packer (4,800) (Tr. 82). She testified that if the above hypothetical limitations remained the same but with the substitution of "light" for "medium" exertional work, the individual could perform the work of a light packer (9,000); light janitor (2,500); and inspector (2,500) (Tr. 82-83).

The VE testified that if the hypothetical individual were also limited to "one, two-step tasks . . . low-stress, meaning no fast paced assembly-line work; only occasional changes in the work; and occasional decision-making as part of the job," the numbers of exertionally medium jobs of groundskeeper and packer would be reduced by 50 percent (Tr. 83-84). If the same individual were limited to light work, the above stated light jobs for janitor would remain unchanged; the packer position numbers would be reduced by 50 percent; and the inspector position would be eliminated (Tr. 84-85). VE Williams testified that the same individual could perform the light work of a ground maintenance worker (2,000) (Tr. 85). The VE stated that her testimony was consistent with the information found in the DOT (Tr. 85).

In response to questioning by Plaintiff's attorney, the VE testified that if the above-limited hypothetical individual "would be unable to tolerate even superficial contact with supervisors and co-workers," or, were "unable to sustain a routine without special supervision and frequent redirection," all gainful employment would be precluded (Tr. 87).

**D.      The ALJ's Decision**

Citing the medical evidence of record, ALJ Inouye found that while Plaintiff experienced the severe impairments of PTSD, anxiety, depression, personality disorder, impulse control disorder, and polysubstance abuse, none of the conditions met or equaled an impairment listed in Appendix 1 Subpart P, Regulations No. 4. (Tr. 19).   The ALJ found that Plaintiff retained the following Residual Functional Capacity ("RFC") for a full range of work at all exertional levels with the following limitations:

> The claimant should avoid all hazards. He is limited to unskilled, simple, routine, and repetitive work.  He is limited to performing one-two-step tasks.  He would work best in small, familiar groups of coworkers.  He should not be required to work in large groups or near large crowds.   He can have only occasional contact with the public, and his contact with the public should be with small numbers, meaning one or two members of the public at a time.   His work should be low stress, meaning no fast-paced assembly line work, only occasional changes in the work, and occasional decision making as part of the work (Tr. 21).

Adopting the VE's job findings, the ALJ found that while Plaintiff was unable to return to his past relevant work as a home care attendant, he could perform the work of a janitor, groundskeeper, and packer (Tr. 25).

The ALJ observed that Plaintiff's offered inconsistent testimony regarding the use of opiates, but determined that he was "not disabled even considering his polysubstance abuse" (Tr. 23).   She found that Plaintiff's "polysubstance abuse [was] not material to the determination of disability" (Tr. 23).   She cited his testimony that he believed that he was not disabled (Tr. 23).   The ALJ discounted statements made by Plaintiff's mother, noting that the mother (1) was "not medically trained to make exacting observations as to dates,

frequencies, types, and degrees of medical signs and symptoms . . ." (2) could not be considered "a disinterested third party," and (3) her claims were "not consistent with the preponderance of the medical evidence"  (Tr. 24).  She gave "little weight" to various GAF scores, noting that the scores were "not indicative of any longitudinal functional abilities or limitations" (Tr. 24).

## II. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### III. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.   20 C.F.R. §416.920(a).   The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five   to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."   *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

### IV. ANALYSIS

Plaintiff makes five separate arguments in favor of remand.   First, he contends that ALJ's credibility determination overlooked the great weight of evidence pointing to a finding of disability and instead, overemphasized small portions of the transcript

supporting the opposite conclusion.   *Plaintiff's Brief* at 7-24.   Second, he argues that

while the ALJ found that he was not compliant with recommended treatment, she did not

consider the cause of his non-compliance as required by SSR 82-59.   *Id.* at 24-26.   In his

third argument, Plaintiff contends that the ALJ erred by finding that a failed work attempt

supported the conclusion that his "abilities were greater than alleged." *Id.* at 26-27 (citing

Tr. 23).   He also faults the ALJ's citation to his "daily activities" in support of her

findings, arguing that his ability to engage in Bible study, play the guitar, and perform

household chores on a sporadic basis did not equate to the ability to engage in full-time

work.   *Id.* at 27-29.   Fourth, he argues that the ALJ erred by discounting the GAF scores

assigned by various mental health providers, arguing, in effect, that the scores were entitled

to the deference according a treating source opinion.   *Id.* at 29-34.   Consistent with this

argument, he argues that the ALJ ought to have provided "good reasons" for rejecting the

GAF scores as required by 20 C.F.R. § 404.1527(c)(2).   *Id.*     Fifth, he argues that the ALJ

erred by rejecting the mother of Plaintiff's assessment of her son's psychological

problems.   *Id.* at 34-35 (citing Tr. 24, 288, 339-345).

       Plaintiff's first and third arguments rely directly on SSR 96-7p for the contention

that the credibility determination placed undue emphasis on certain records at the expense

of others, and can thus be considered in tandem.   While all five arguments either directly

or indirectly challenge the credibility determination, arguments two, four, and five will be

addressed separately.

A.   **The Credibility Determination**

1.   **Applicable Law**

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms.   "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186, *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record." *Id.* [9]   An ALJ's credibility is entitled to deference by the reviewing court. See *Walters v. Commissioner of Social Sec*., 127 F.3d 525, 531 (6th Cir.1997) (because "an ALJ is charged with the duty of observing a witness's

---

[9]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

  (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

demeanor and credibility," the "findings based on the credibility of the applicant are to be accorded great weight.")

## 2.  Application

Plaintiff faults the ALJ's statement that his symptoms were "'not credible to the extent they are inconsistent with the above residual functional capacity,'" contending, in effect, that the ALJ worked backwards by first crafting the RFC and then cherry-picking the record for evidence supporting it.  *Plaintiff's Brief* at 9 (citing Tr. 22).

Plaintiff's contention that the credibility determination amounts to a distortion of the record is not well taken.  While he points out that he was hospitalized on multiple occasions during the relevant period, the ALJ correctly noted that the inpatient hospitalizations generally lasted for one week or less (Tr. 22).  She did not err in finding that Plaintiff's condition improved over the course of each hospitalization, citing October, 2010 discharge records stating that he was "alert, friendly, talkative, and free of any acute psychotic symptoms or anxiety problems, and March, 2012 discharge records stating that "his mood was 'much improved'" (Tr. 22, 698).

While Plaintiff faults the ALJ for providing a truncated discussion of the hospitalization and therapy records, in fact, the discussion of these records amounts to almost an entire single-spaced page (Tr. 22-23).  Moreover, she did not restrict the discussion to portions of the transcript supporting the non-disability decision, but instead, cited records referencing auditory hallucinations, cutting, suicidal ideation, and lack of impulse control (Tr. 22).  Plaintiff points to no case law suggesting that the ALJ was

required to include mention of every page of the 450-page medical transcript in her decision.   *See Kornecky v. Commissioner of Social Security,* 2006 WL 305648, *8–9 (6th Cir. February 9, 2006)( *citing Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999))("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each ... opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party'").

Plaintiff criticizes the ALJ for failing to cite Plaintiff's "prior treatment and education record going back to 2002." *Plaintiff's Brief* at 11.   However, Plaintiff did not allege disability until January 1, 2009.   As such, records predating the alleged onset date (while cited by the undersigned for background purposes) are irrelevant to the benefits claim.   Moreover, Plaintiff's limited education was factored into the hypothetical question posed to the VE as well as the conclusion that he could perform a range of unskilled work. While Plaintiff challenges the ALJ's reliance on his March, 2012 statement that he was "much improved" at the time of a psychiatric hospital discharge, *Plaintiff's Brief* at 12 (citing Tr. 22, 698), the same discharge records state that he denied suicidal thoughts or hallucinations and exhibited a "spontaneous and goal directed" thought process (Tr. 698).

Plaintiff's additional contentions regarding the credibility determination are also unavailing.   He argues that the ALJ erroneously cited unsuccessful work attempts in support of the conclusion that "[his] abilities were greater than alleged." *Plaintiff's Brief*

at 26 (citing Tr. 23).   However, while Plaintiff stated that he was unable to perform the work of a care giver and had been terminated from a second job, he had been able to fulfill the job requirements of a cook position (Tr. 41-43).   The ALJ did not err in finding that Plaintiff's limited work activity (while not substantial gainful activity) supported the non-disability finding.

Finally, Plaintiff faults the ALJ for citing his ability to sustain a long-term romantic relationship, attend Bible study, and play the guitar in support of her findings, noting that the emergency room records demonstrate "a pattern of self-destructive behavior and an inability to conform to societal norms."   *Id* at 28-29 (citing Tr. 23, 659-675).   However, the ALJ noted that Dr. Strait, after examining the records predating her September, 2011 review, found that Plaintiff was nonetheless capable of performing unskilled work with additional restrictions.   While Plaintiff notes that Dr. Strait was not privy to records created subsequent to September, 2011, those records do not show that Plaintiff's mental condition deteriorated between September, 2011 and the May, 2012 administrative decision.   While October, 2011 records show that Plaintiff expressed suicidal ideation (Tr. 643), treating notes from the same month state that he was depressed because his grandmother died and he experienced relationship problems (Tr. 499).   It is worth noting that Plaintiff testified at the hearing that he did not believe that he was disabled, despite his psychological conditions (Tr. 44).

### B.  SSR 82-59

Plaintiff argues that his failure to abide by treatment recommendations was

improperly cited in support of the non-disability determination.   *Plaintiff's Brief* at 24-26.
He contends that the ALJ failed to follow the requirements of SSR 82-59 by not inquiring
as to the reasons that he was non-compliant.   *Id.*

SSR 82-59, codified at 20 C.F.R. § 416.930(c) and § 404.1530(c), is wholly
inapplicable to the present case.   "SSR 82–59 . . . provides that a claimant who does not
provide a treatment prescribed by his physician that can restore his ability to work must
have a good reason for not following that treatment in order to be found disabled." *Hatcher
v. Commissioner of Social Sec.,* 2013 WL 5291622, *6 (E.D.Mich. September 19,
2013)(Michelson, J.).   Examples of reasons for not obtaining treatment include objections
to a procedure on religious grounds; reluctance to undergo cataract surgery in one eye
when the other eye is impaired; the procedure's "enormity," such as open heart surgery; or,
the amputation of a limb. § 416.930(c).   The ALJ's thorough questioning of Plaintiff and
review of the record does not suggest similarly compelling reasons for misusing
prescription drugs, abusing opiates or illicit drugs, or failing to attend therapy sessions (Tr.
382, 389, 399, 434, 441, 501).

Further, the "[f]ailure to follow prescribed treatment becomes a determinative issue
only if the claimant's impairment is found to be disabling under steps one through five and
is amenable to treatment expected to restore ability to work."   *Hester v. Sec. of Health &
Human Servs.,* 1989 WL 115632, *3 (6th Cir. Oct. 4, 1989).   In contrast here, the ALJ
found at Step Five that despite Plaintiff's polysubstance abuse he was not disabled (Tr. 23).
While Plaintiff argues that his "failure to receive treatment for mental problems may be a

–23–

symptom of a mental disorder," *Plaintiff's Brief* at 25 (citing *Blankenship v. Bowen,* 874 F.2d 1116 (6th Cir. 1988), he points to no evidence showing that he was not aware of his need for mental health treatment.   Accordingly, remand is not warranted on this basis.

### C.   Weight Accorded the GAF Scores

Plaintiff faults the ALJ for giving little weight to GAF scores assigned by various medical sources.   *Plaintiff's Brief* at 29-34 (citing Tr. 24).

A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *White v. Commissioner of Social Sec.*, 572 F.3d 272, 276 (6th Cir.2009) (citing *Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 fn. 1 (E.D.Mich.2005)). "A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues. *Oliver v. Commissioner of Social Sec.,* 415 Fed.Appx. 681, 684, 2011 WL 924688, *4 (6th Cir. March 17, 2011) (citing *White,* 572 F.3d at 284). "'The GAF scale ... does not have a direct correlation to the severity requirements in [the regulations'] mental disorders listings.' " *Oliver,* at *4 (citing 65 Fed.Reg. 50746, 50764–65 (2000)). See also *Kornecky, supra,* 167 Fed.Appx. at 511, 2006 WL 305648, *13 (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002)) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place").

Citing Fed.Reg. 50746, 50764–65, the ALJ correctly noted that the Commissioner "has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements [of the ] mental disorders listings" (Tr. 24).

Plaintiff argues that the scant evidentiary value placed on the GAF scores represents a misreading of Fed.Reg. 50746, 50764–65, which in fact endorses the use of the scale in making prognoses and assessing functional abilities.   *Plaintiff's Brief* at 31-33.   He takes this argument one step further, asserting that the assignment of a GAF should be given the deference accorded a treating physician's opinion.   *Id.*   He relies on 20 C.F.R. § 404.1527(c)(2), which requires the ALJ to provide "good reasons" for rejecting a treating physician's opinion of limitation or disability.

This argument is unavailing, even assuming for the sake of argument that GAF scores are entitled to some degree of consideration.   For example, while in October, 2010, Plaintiff received a GAF of 20 ("danger of hurting self or others") upon admittance to a mental hospital (Tr. 392), he was assigned a GAF of 60 upon discharge, indicating, at most, moderate social or occupational difficulties (Tr. 389).   Assuming that the GAF of 20 represented an opinion of work related limitation,   the evidence shows that Plaintiff was thus limited for a few days at most - vastly short of the 12 months of continuous disability required to establish a disability claim.   Putting aside the arguable importance of GAFs, a treating "opinion" of a limitation lasting for a few days only has little evidentiary value in determining whether the claimant experienced such a limitation for 12 months.   For

–25–

example, an ALJ would not be required to provide "good reasons" to discount a treating physician's opinion his patient was unable to work for one week because of the flu. Admittedly, at the time of Plaintiff's March, 2012 discharge, he was assigned a GAF of 50, suggesting either serious or at least moderate psychological symptoms (Tr. 698, 700). However, the significance of the score is undermined by the fact that none of the treating notes created in March, 2012 suggest that Plaintiff was deemed unable to work and in fact, include recommendations to attend occupational therapy (Tr. 681).    None of the other treating records contain an opinion of disability by a treating source, but rather, state that Plaintiff had been encouraged to find a job (Tr. 518).

### D.   The Weight Assigned to the Opinion of Plaintiff's Mother[10]

Plaintiff argues last that the ALJ erred by rejecting his mother's opinion of his condition.   *Plaintiff's Brief* at 34-35

---

[10]Plaintiff does not cite his the letter composed by his mother in July, 2012 in support of remand.   See above, Section I.B.3.

Pursuant to 20 C.F.R. § 404.1513(d)(4), the ALJ may consider evidence from non-medical sources such as neighbors and clergy members "to show the severity of . . . impairments." The ALJ is entitled to accord the weight given to "other source," evidence. *Id.* "Perceptible weight must be given to lay testimony where . . . it is fully supported by the reports of the treating physicians." *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).

Plaintiff aptly notes that the ALJ's observation that his mother's opinion was "colored by affection" could be used to discount the opinion of any relative offering personal observations about a claimant. *Plaintiff's Brief* at 34. While this portion of Plaintiff's argument is well taken, I agree with ALJ's finding that the mother's medical conclusions regarding the severity of Plaintiff's condition were beyond her expertise as a layperson (Tr. 24). The ALJ also found that the claims made by Plaintiff's mother were "simply not consistent with the preponderance of the medical evidence . . ." (Tr. 24).

The first five pages of the April, 2012 seven-page letter refers to Plaintiff's developmental history but omits all mention of the traumatizing domestic events recounted in the therapy records (Tr. 339-343). She states that Plaintiff experienced hallucinations prior to his March, 2012 hospitalization (Tr. 344-345). However, Plaintiff's testimony and treating records indicate that he sought inpatient treatment in 2012 soon after experiencing hallucinations and that the hallucinations were attributable to a drug interaction (Tr. 698). The hallucinations stopped after a medication change (Tr. 698). While Plaintiff's mother mentions his June, 2011 suicide attempt, the same

episode is referenced in the treating records and Plaintiff's testimony and does not provide new insight into his condition. Because this evidence is mostly unrelated to the relevant period, and in some respects conflicts with the medical record, the ALJ did not err in assigning it little weight.

Because the ALJ's findings were well articulated and within the "zone of choice" accorded the administrative fact-finder, the Commissioner's determination should be upheld. *Mullen, supra,* 800 F.2d at 545. Nevertheless, after carefully examining the testimony, treating records, and other evidence, I commend Plaintiff, a young adult, in his quest to lead a productive and fulfilling life, notwithstanding his past hardships.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith*

*v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).   Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate

Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.   The response shall be not more than 20 pages in

length unless by motion and order such page limit is extended by the court.   The response

shall address specifically, and in the same order raised, each issue contained within the

objections.


Dated: February 10, 2014          s/R. Steven Whalen
                                  R. STEVEN WHALEN
                                  UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on
February 11, 2014, electronically and/or by U.S. mail.

                                  s/Michael Williams
                                  Case Manager for the
                                  Honorable R. Steven Whalen

–29–